And we will hear finally United States v. Girardi at now. I please the court, Alexandra Shapiro for Stephen Aiello. The Wire Fraud Statute only prohibits schemes to defraud victims of money or property. The government's theory here that any theoretical failure to share potentially valuable economic information as money or property fraud goes farther than any other prior right-to-control case. As Binday explains, this Court has repeatedly rejected money and property fraud where the victim received the full economic benefit of its bargain. And in every case affirming a conviction, there has been a showing of actual or potential economic harm to the victim, but this case is different. The government did not prove that Fort Schuyler didn't receive the benefit of its bargain or that it could have made a better deal or that anyone misrepresented facts exposing Fort Schuyler to economic risk. The government's theory cannot be reconciled with McNally or this Court's decisions in Starr, Novak, Regent, Mittelstadt, and Shelef, not to mention its reasoning in cases like this. I can't explain exactly what the detailed evidence in Finazo in particular and also in Binday showed in terms of how the alleged fraud in those cases had actually affected the price and quality in the Finazo case of the products there. Essentially, the government's theory here is that steering business to a friend, which is merely at most a fiduciary breach, steering business to a friend and just hiding facts about that amounts to money or property fraud. That's not even honest services fraud under Skilling where you have to also have a bribe or kickback, and it certainly isn't money or property fraud under McNally. In addition, in this case, not only did the government fail to prove any potential economic harm or any intent to affect economic harm, but the defendants were precluded from introducing evidence that they complied with the contract and Fort Schuyler got the benefit of its bargain, got high-quality buildings at a fair and reasonable price. On the first part of that argument that you just made about how the government hasn't proved that there was any harm to Fort Schuyler, I understand their theory to be that by not having the opportunity to hear from more bidders, which they would have if the RFP had not been they were deprived of the opportunity to compare price, quality, innovation. These are their arguments. If I understand it again, this is not a case like Finanzo where personal animus was irrelevant to economic concerns. Their theory is that having more competitive bidding would have affected price, quality, and innovation, all economic considerations. Tell me why that is not the way we should look at this. Well, first of all, if you actually look at the facts, particularly on the core side of this, there wasn't another bidder, but there was ample testimony from numerous witnesses who worked at Fort Schuyler that the RFP qualifications were fair and reasonable, and the board was also fully aware of the details of those RFPs. And so— There might have been other bidders if the RFP hadn't been so tailored? Well, but that would be the case in any of these cases. For example, in the Middlestadt case where you have several different examples in which somebody who's working for the county, I believe, in these villages, is steering business to entities that it has an interest in, that's no different. I mean, basically what you have is, at worst, a Caliero steering business to particular companies, and then the real question is, you know, these were—just to take a step back, I mean, the projects here were extremely complex projects that required a certain level of skill, and they wanted local developers, because the whole point of this program was to inject state money into these troubled upstate communities that were having economic problems. And so it made sense to try to have an RFP that would attract a local developer with a capability to build these kind of sophisticated projects. And the government— Back to us, I'm going to ask—or the government to address this. Should it matter that Fort Schuyler had the opportunity to see the RFP? Might this be a different case if it had never been aware of what the RFP was asking of bidders? Well, it certainly might well be a very different case if you hadn't had the involvement and sign-off on the board on the actual specifics of each of the RFPs in question, for sure. So, for instance, I'm asking this because, at one point, when the RFP wanted someone with, what was it, 50 years' experience, and if the board had thought that was a ridiculous requirement or an unnecessary requirement, it could have said so. That's absolutely correct, Your Honor, and just to be clear, and others may address that in more detail, my understanding with respect to that is, well, that was only on the Buffalo side, the 50-year, and then it was actually a mistake that was corrected. And on the other side, it was only 15 years from the beginning. But the same way, if they had thought we don't need 15 years' experience, they could have said so. Absolutely, Your Honor. I see my time is up. I'll defer to my colleagues. Thank you. May it please the Court. My name is Milton Williams. I represent Appellant Joseph Girardi. I just want to pick up right away with a question that Judge Raji asked concerning the lack of the response to the RFP. I believe during the course of the trial, I think it was Dean Fulohan, who was a board member or key personnel at Fort Schuyler, who said the lack of the response was due to the fact that there were no specific construction projects attached to the RFP for the preferred developer designation. From our standpoint, on behalf of Mr. Girardi, this is not your typical bid rigging case, classic bid rigging case at all. What happened here was you had a preliminary screening process whereby Mr. Girardi did give input on the provisions and qualifications, which is not illegal. After giving that input, these provisions and qualifications were vetted by Fort Schuyler's procurement chief as well as their legal staff. And at the time that Mr. Barber and Mr. Schell, the board chair and the procurement chief, testified at trial, they were well aware of the allegations in this case, and still they testified that the RFP, the provisions in it were pro-competitive, fair, not tailored to core, and in Fort Schuyler's best interest. Right there, that creates a big hurdle to the government demonstrating that there was any risk of tangible economic harm. There was substantial evidence that the RFP was tailored. I mean, there may have been evidence the other way, but that would have been up to the jury to resolve. And, Your Honor, just to take a step back, in construction development cases, and this also came out of the testimony of Fort Schuyler witnesses, I think Foulihan, Mr. Gair, Walter Barber, and I also believe Joseph Schell, and also even the government's co-operator, Kevin Schuller, that in the construction development industry, it is not uncommon for an entity that is going to run an RFP to ask for input from developers who are actually, at the end of the day, going to end up bidding on the RFP. So there's nothing untoward about that. And at the end of the day, those provisions not inherently, but it can be if it's done in a way so that only one particular developer is consulted and has that advantage, right? I mean, it's one thing to ask everyone to weigh in. It's another thing to ask one particular party to weigh in, and then to do it in a way that advantages that party. Well, that may have been the case had Fort Schuyler's key personnel not had a chance to vet the qualifications themselves. And they did vet them. So they determined before releasing the RFP themselves that the provisions were fair and pro-competitive. And what really underscores that point and kind of belies the government's case is that the same RFP, Syracuse RFP, was the first one out of the box. And then it was the same exact RFP was used in five other regions where CORE wasn't even competing or wasn't even trying to do a project. And so if, indeed, there was tailoring here just for CORE so that CORE would win the Syracuse RFP, the preferred developer designation, well, then how could that same RFP be used over and over and over again in regions where CORE wasn't even competing? And so that kind of underscores the point that the RFP was fair, notwithstanding the fact that there is a potential view of the evidence, as I'm sure the government will point out, that there was or may have been some intent to deceive or intent to exclude. But you really have to separate out, from my standpoint in the analysis, the difference between differentiating between the intent and actually showing objective criteria of a tangible risk of economic harm which doesn't exist here. First of all, the government, I mean, Fort Schuyler was never deprived of an opportunity to negotiate the best terms, to negotiate with whomever they wanted to negotiate with. There was also no deception at all at any time as to the qualifications of CORE to perform the services that they promised at a certain price and the actual services they were going to do. None of that existed here. So even if this panel and this court is disturbed or your eyebrows are raised by some of the what you were describing, Judge, and you may see that there was an intent, to exclude other competitors and or to deceive, it doesn't still meet the threshold of demonstrating a risk of tangible economic harm. Here, what we're asking this Court to do is to really the Court has already had, this Court already has the framework here. We're asking you to just reapply the clear, bright line of demarcation between cases in which there's mere deceit, which this may fall into, perhaps some intent to exclude in a preliminary initial screening process, versus cases where the fraud goes to the fundamental part of the bargain, which is typically price and quality. And that didn't happen here, as there was no deception as to the actual services to be performed. And that's what differentiates this case from others. In every contractual setting, okay, if there were omissions and misrepresentations and the right to control wire fraud was applied, it would be too expansive, especially in this case where there was no actual exclusion of anyone. And as I've said before, the provisions, according to key Fort Scholar personnel, were fair, pro-competitive, not in core or not tailored to core, and in Fort Scholar's best interest. Thank you. Thank you very much. Good morning, Your Honor. In my four minutes, I'd like to try to cover four quick points. Judge Chin, you asked about the tailoring of the RFPs. Let me just – this is in the record, but the key aspects of the RFP that were changed, Your Honor, added a provision emphasizing MWBE contracts. Every witness who testified said that was consistent with the Governor's objectives with all State contracts, number one. Number two, local contractor. Again, I think it was Anthony Kennedy, Andrew Kennedy, testified for the government that having local contractors handle this work was consistent with trying to revitalize the economy in those towns. Number three, sophisticated software. This was language that every witness who testified for the government agreed you want to have a contractor that knows how to manage sophisticated construction projects with sophisticated software. Number four, alternatives to financial statements. Everybody agreed that that expanded the pool of potential candidates. So what you're left with, when all is said and done – and I appreciate your question about the 50 years, which was immediately corrected and had no impact on the bidding – the substantive changes to the RFP were all good for Fort Scholar and did not specifically benefit any one particular potential competitor. So that was my first point. Second – Somebody thought it benefited them if they paid for it. Pardon? Somebody thought it benefited them. They paid for it. But there's no – That's the whole theory of the case, right? There's no – there's no allegation – there's no allegation anywhere in this case, if I understand your question, Judge Rodger, that anybody paid a bribe or a kickback. There was no payment made for the changes that were made to the RFP. I think, as my colleague, Mr. Williams, pointed out, every witness who testified that they understood the industry explained that it is not uncommon for contractors to speak to potential customers to provide ideas that go into the RFPs, to be allowed to bid on those RFPs and to actually win those RFPs. And there's nothing, Your Honor, Judge Rodger, there's nothing in the record that suggests for a moment that either Seminelli or CORE paid anything to get those changes made in the RFPs. And frankly, no evidence anywhere that Dr. Cagliaris accepted a bribe or a kickback. Third point. Ms. Shapiro opened by arguing that the defendant should be acquitted. I want to echo that point. If you look at the government's brief at page 161, in the government's brief at page 161, they acknowledge that through the torturous route that the jury instructions in this case provided, at the end of the day, the government had the burden of proving beyond a reasonable doubt that there was an economic discrepancy between what Fort Schuyler reasonably anticipated it would get from its contracts and what it actually got from its contracts. And the government concluded by saying that the jury had to acquit if the jury was not a very significant concession and entirely consistent with the language from Bin Day that Ms. Shapiro already read to you. So what was the bargain at issue in this case? If you take a look at the government's opening statement, look at the very first paragraph of the government's opening statement, they tell you what the bargain is in this case. If I can just quote briefly, this is a case about lying and cheating to get huge state construction contracts worth hundreds of millions of dollars all paid by the taxpayers of New York. Cagliaris rigged the competition to make sure that the companies he liked would win those massive state contracts. That's at A1012 transcript at 37-4-11. And then with their key cooperator, Kevin Schuyler, you heard about him from Mr. Williams, the government asked him at A1172 transcript 1011-4-9, question, were the actions that you took consistent with a competitive RFP process? Answer, no, they were not. Question, what, if anything, did Simonelli get as a result of that conduct? Answer, a contract to build what was known as the SolarCity plant. Question, do you know approximately how much that contract was? The cases, including Fanazzo, require only that the misrepresentations or nondisclosures can result in tangible harm. There doesn't have to be tangible harm. And why wasn't Fort Schuyler exposed to the potential of tangible harm by the limitations potentially on the bidder pool? First of all, the RFP did not limit the number of candidates who could participate. If anything, it expanded that pool. Number two, the language that was allegedly tailored wasn't even visible to a potential candidate unless they requested a copy of the RFP and got it. So I'd say the fundamental premise is that this process didn't limit the number of potential candidates, number one. Number two, I completely agree. I don't think anybody will quarrel with the notion that the right to control jurisprudence as it exists right now says that the scheme must be What you're saying is that people can fix a bid, and as long as the government can't prove actual economic harm, then that's okay? I think what the case law, Judge Chin says, including the Fanazzo case, is that right to control wire fraud is not committed if all that happens is that the victim ends up doing business with somebody it might not otherwise have chosen to do business with. That is why, in the record below, you see repeated reference to the fact that I think even Judge Caproni appreciated that the government had to prove bid rigging plus. And the bid rigging plus is not just an assumed, hey, you know, because you selected a particular contractor to win this RFP process, others didn't compete, therefore, we're going to assume that you got ripped off or could have been ripped off on price and quality. Something more was required. And that evidence wasn't presented in this case. And so my fourth and final point is, for all of those same reasons, without any question, the defense should have been allowed to establish that Fort Schuyler did get the benefit of the bargain. The evidence, the record is just replete with efforts, mostly spearheaded by my colleague, Mr. Schachman, trying to persuade the judge to let the defendants prove that the buildings in Buffalo and Syracuse were built on time. But is that the bargain that is at issue, or is it the bargain of an RFP that would have favored, favored contractor? And that that was what they did not get. Is that the bet? I mean, I am concerned that when you say you were entitled to show that they got the benefit of the contract they ultimately entered into, I'm not sure it's that contract that the government is focused on here. Well, so I think it's clear from the record that the case that the government tried, and again you look at their opening statement, you look at their examination of Schuyler, and frankly, you look at the testimony of the two construction company representatives, Bills and Balling, who should never have been allowed to testify. They had no particularly relevant, they were not competent witnesses. You're trying to answer my question rather than taking us on detours. Isn't it that they contracted for a competitive RFP, and that's what they didn't get? The ultimate bargain in this case that the government tried to prove to the jury through its opening statement and its witnesses was that the ultimate bargain, the brass ring, what this whole thing was about was a scheme to get these massively valuable contracts in upstate New York, not just to win the RFP. And frankly, Your Honor, if at the end of the day the scheme was just to get the RFP, there is no way just getting the RFP, becoming the preferred developer, had any implications with respect to potential or actual harm. And I think the government has conceded that preferred developer status is not property. If you took a look at A996 at 116, I think the government has actually conceded that. So if the world is exactly as you have described it, there is no right to control wire fraud. If the world is as they tried the case, which is the brass ring were these that Fort Schuyler was not exposed to potential or actual harm, and the defendants should have been allowed to prove that these projects were completed on time, exceptionally well, sophisticated, cutting-edge buildings, on time, brutal weather conditions, everything, and on budget and at a commercially reasonable price. We have your argument. Thank you. Thank you. And thank you for letting me go along. I appreciate it. We'll hear from Mr. Schack. May it please the Court. I get to bat fourth in this batting order. Lean up. I hope. And Mr. Shapiro has been nice enough to say that with the Court's permission, I could get first rebuttal and, indeed, to give me a minute of that. And if that's acceptable to the Court, it would be appreciated. Let me begin by saying this. None of us are asking this Court to overrule any of its prior right-to-control cases. I think what all of us are saying is this is the right to control on steroids, for lack of a better expression. And, Judge Chin, you mentioned Farnazzo. And I think it's helpful to talk about it. Farnazzo is a case in which the defendant was an employee of Arapastol, if I say it right. And what he did was divert its T-shirt and fleece business to a company, South Bay, that he had an undisclosed interest in. When you look at the opinion in the case, particularly the lengthy sufficiency discussion, what you see is that diversion, right, cost Arapastoli both in terms of excessive price and bad quality. I've joked about the case that, you know, you're giving them fleeces that cost too much and quality is bad, so that one can truly say that Arapastoli, I apologize for this, was fleeced. And they were, right? Now, step back and ask the following question. What if none of that were true? What if he diverted it to South Bay, but South Bay's prices were reasonable and the quality was good, right? You would say to yourself, well, a lot of what was written in that case to support sufficiency is gone, right? But more importantly, I hope what one would say to oneself is, look, it's a terrible thing. It's Judge Chin's point. It's nothing to be happy about if your employee is diverting something to a company that he has an undisclosed self-interest in. But that cannot be wire or mail fraud, because if it were ‑‑ a comparable product at a lower ‑‑ It would not be wire or mail fraud, because if it were, you would be overruling McNally and Skilling and, indeed, Middlestadt. But it has to be potential harm, right? And so if an honest RFP process would have attracted more bidders and more competitive bidders, then ‑‑ Judge, an honest process in Fanazo might have attracted other companies, right? An honest process in McNally might have attracted other insurance companies. An honest process in Middlestadt would have told that village, this guy has a hidden interest. But what the Supreme Court taught in McNally, and this is a 1341 case, is that undisclosed self‑dealing by a private employee is not mail or wire fraud. And that is Fanazo without the proof of harm, that what you have is steering it to your own company. And that cannot survive McNally or Skilling or Middlestadt. And that is why I suggest when it came to discussing that case, right, when it came to the sufficiency section, the court didn't write, well, this has the potential, right, to harm our pistole. The court said this costs our pistole money and property. And remember, one is starting with a statute here that says you've obtained money and property. So my submission to you is it's not good to self‑deal. It's not good to steer something to your own company. It's not good to sell property to your village that you have an interest in and not tell them. But that is undisclosed self‑interest. Remember, when you look at Skilling, Skilling is a 1346 case, right. The court says, I think I'm right in saying it's Justice Ginsburg, says, look, you need a kickback or bribery. And the government says one step further, right. The government says the step further is that a private employee, right, is depriving his employer of information that he would want to know. It's a breach of a fiduciary duty. And the court said, we're not going to go that far. Well, that's this case. You're back to saying to yourself, you don't need economic harm. You don't need higher prices. You don't need worse quality. All you have to do is hide the fact that you're self‑dealing. And that says all you need is the breach of a fiduciary duty, and that can't be mail or wire fraud. So that's where I think this case takes you. And I think if the court goes there, you have to say McNally is different and line up the facts, right. Make Kentucky Fort Schuyler. Make the employees there, the people here. And it looks identical, and we know it is not a mail fraud crime. If I could get another minute, and I do this asking your forbearance. Go ahead. One minute. Lou Simonelli, whatever the theory here is, Lou Simonelli is not guilty of this. You start with a proposition that what was rigged on the Buffalo RFP. And the answer that came from the star witness is the 50 years. Judge, I'm not sure that's a mistake. I think you could spend your whole life trying to type 15. If you get 50, that's a great piece. I understand. That's great. But it wasn't done by Mr. Simonelli, and he protested, right, when he saw it. The second thing that the cooperator tells you is that this had to be locust in Buffalo. But that's true of all of these projects. And the governor's head economic advisor said that was the purpose of all of this. So in terms of the Buffalo RFP, I don't know what here is tailored. But assume it was. And I plead with you. You know, you have wonderful language in your cases about how sufficiency has to be taken seriously because it's of the utmost importance. It's especially so in these political corruption cases. It's hard to try these cases, right? People think New York is dysfunctional and corrupt. But I plead with you to look at our brief on page 48 and 49. There's a chart there. Mr. Simonelli encouraged me to put the chart there. And at each step of those, he did not do anything. That's all he did. And last words, I've done this long enough to know that if you say to a court, ask my opponent, it's really not good form. But if you ask my opponent, what is false on page 48 and 49, the answer, I think, will be nothing. So I don't think Mr. Simonelli did anything wrong, no matter what the standard is, and I thank the court. Thank you. We'll hear from the government. May it please the court. Again, my name is Matthew Podolsky, and I represent the United States on this appeal, as I did at trial below. Well, let me start with just a simple statement. This case was tried in front of a properly instructed jury, which convicted on all counts. The only question really at issue here and the only question that's been discussed is sufficiency. And the sufficiency of the evidence is absolutely clear in this case. Maybe it would be helpful just to emphasize a few facts. We've had four defense arguments, four defense replies. And in those replies and in the arguments, there's quite a number of assertions about what the evidence was at trial. There was no rigging. It didn't really hurt Fort Schuyler and so on. But all of these issues were actually tried to the jury. They were contested at trial, and the jury found for the government. And what did they find happened in this case? First, there was hundreds of millions of dollars of public money available for development in upstate New York. It wasn't clear how much it would be initially. It ended up the projects in this case were worth about $850 million at the end of the day. That money was controlled by an entity called Fort Schuyler, which had a board. And the board controlled that money. The board also had rules to ensure transparency and competitiveness when it came to awarding the contracts and awarding that money. Now, the defendants wanted to take control over that money. They wanted to get the money, and they wanted to avoid the possibility that another competitor, another company, another developer, another construction manager, could come in and essentially outbid them in the competition. Kevin Schuyler talked about this at some length. He talked about the possibility that a competitor could either die for the business, that is, offer a lower price, or a bigger company, a national company, could come in, the kind that Simonelli competes with, and get the contracts. So what did they do? They took control of the money. And the way they did that is they worked with Lynn Cagliaros on the inside to create a process that they represented was competitive, represented, complied with the expectations and rules and processes of Fort Schuyler, but did not. And what did they get in exchange for that? They got the authority, the right to control the money of Fort Schuyler. And that is explicitly captured. It's embodied in resolutions of the board and in the contracts that the defendants obtained. So I would just point the court to Government Exhibits 1015, which is the authorization, a board resolution, the authorization to proceed with an RFP for the Buffalo area, specifically saying that Fort Schuyler would have to follow. So the defendant's response to all of that would be so what? In other words, where's the harm? So thank you. And that is obviously a main point of contention in this case. So the harm, number one, is the prevention of another company coming in and offering a better value or a better service to Fort Schuyler. Kevin Shuler talks about this in his testimony. He explained that was the thinking behind this scheme. It's we didn't want some other company to beat us. And, frankly ---- Well, that's the intent. Is there any evidence that that's the effect? Yes, there are. The likely effect? So, first of all, I think, and this is, for example, in Chandler, the court has made clear in these cases that where the intent is clearly reflected in the nature of the scheme, you don't necessarily have to have the effect. But let me actually point to some evidence in the record about that. And that's the testimony of Mr. Bills and Mr. Bolling, who were competitors in the Buffalo area. And what they both said is, we looked at this RFP, and it was clear to us this was rigged, this was targeted to get to Simonelli. I think it was ---- now, Bills and Bolling, the names often get confused. I think it was Lend-Lease. I believe that was Bolling. But I may have mixed them. Said we didn't even apply because it was clear to us that this thing was rigged. It was set up for Simonelli. The other one did put in a bid, understanding that it was not going to work out. And, of course, they didn't win. So ---- How was that affected by the rigging of the RFP? Right. So what they ---- A bid that wasn't successful, but he qualified to put in a bid. Right. So the point being, yes, I put in a bid. I wasn't precluded from doing that. But I knew I wasn't going to win the bid because the way this was designed was to make sure that I wasn't going to win. So no surprise that I didn't win. The whole system was set up so that Simonelli would win, and they did. Is there evidence that they would have done better? They would have made a lower bid. They would have undercut what they did had they not thought that it was dead on arrival. So, no, there is not proof that, at the end of the day, the building would have been better or a different ---- better material or anything like that. But this actually goes, I think ---- No, no, I'm talking about the bid. Is there any evidence that ---- so you just gave two examples of one potential bidder who didn't bid and one who did bid. For the one who did bid, is there any suggestion that they would have bid differently had they not perceived this as a rigged process? If I understand Your Honor's question correctly, it's that they would have put in a better bid or a ---- A better bid, a different bid, a more ---- Right. So my point is that they might have put in the best bid they could. This was designed so that they couldn't win it. It would not be competitive. No matter what they put in, LP Simonelli was going to win this, was going to win the RFP process, and they were going to get the contract. I thought the fraud here was creating an RFP that was tailored to result in the defendants winning. Correct. The status as preferred bidders. Ultimately, though, the contract between the preferred bidder and Fort Schuyler was done by Fort Schuyler, correct? The contract? Yes. That's right. It was ultimately the way it worked was the board ---- So if you put in a bid, Fort Schuyler is going to get to evaluate which is the best bid, right? I mean, I'm not sure I understand your argument that we should think that the unsuccessful bidder was somehow unable to compete. He could put in his bid in Fort Schuyler and decide which one was the best one. It wasn't the defendants who were going to make that choice. Am I missing something? Yes. So two responses. One is, and the main response is really the defendants were choosing that. Here's why. One is, in two ways. One is the way that the RFP was designed was to make it so that L.P. Simonelli would be favored when evaluated. So it was designed not to be competitive. It was designed to match what they would be strongest at. And so, therefore, everybody else would be, even if they were better in some other ways that were good for Fort Schuyler, they would be disadvantaged competitively just so that Fort Schuyler, excuse me, so that L.P. Simonelli could get the contract, could get the money. There was actually a second way, though, which came out in trial, which is that the testimony showed clearly, and there was no real dispute about this, that Alain Cagliaros, one of the co-conspirators in this case, really was able to exercise control over this entire process and make sure that it went the way that he wanted it to go. There was e-mails to this effect between Schuyler, Howe, Cagliaros. The testimony of Kevin Schuyler makes this clear. Along the way, in order to sort of avoid detection of the favoritism here, Cagliaros comes up with the idea that there will be two winners of the Buffalo RFP. Tell Schuyler, though, don't worry. You are still going to get the Riverbend project, the one you care about. And, indeed, you can even pick the other person who gets this sham. And I'll make sure that the process works out that way. And it did. In fact, there's evidence in the record of Lou Simonelli and Schuyler joking about how the other bidder didn't even understand why he won, and it was because Simonelli picked him. So it's a long way of saying, no, the other bidders, even if they actually, for a fair and competitive process, would have offered something better to Fort Schuyler, it was designed to make sure that they could not. They could not. And I'll say that... I'm concerned about the fact that not only did Fort Schuyler make the ultimate negotiation decision, but they also made the ultimate decision on whether to accept this RFP, didn't they? Well, so I think it would be helpful to be... I'll try to be precise about Fort Schuyler as an entity. We often use it generally. So there's the people who are working every day designing the RFP and dealing with the day-to-day work of Fort Schuyler, who are... Functionally, it's run by Elaine Cagliaros. That's what the testimony was. But it's the board. It's the board of Fort Schuyler that has the power to do this. That's why they need board resolutions, each one of which says there must be a competitive process, and, indeed, we are only permitting you, Fort Schuyler, meaning the day-to-day employees controlled by Elaine Cagliaros, we will permit you to enter into contracts with CORE and LP Simonelli only because there was a competitive process of which they were the winners. And that is captured in board resolutions, Government Exhibit 1015, 1017, 1016. Those are board resolutions essentially conferring control over the board's resources, the contracts and the state money, to Elaine Cagliaros. And, again, in each one of those, it was said, following or as a result of a competitive process, we are now bestowing the power to enter into contracts with the co-conspirators. I understand that that is part of the record evidence, but I guess my concern is when the board is presented with the RFP that's going to be issued, presumably they have obligations to satisfy themselves that it is, indeed, a competitive product. I mean, when I asked my first question about the 50 years, it struck me as curious that it would take an investigative reporter to figure out that there was that problem rather than, you know, the board that is reading it. And to that extent, if they have the ultimate ability to say, no, this is not what we want with respect to the RFP, or if they have the ability when only one bid is received or only two bid is received to say, this isn't competitive enough, we want more options, and then ultimately to decide what kind of a contract they're going to go into, it's difficult for me to see how they are deprived of control of their property. Help me out. Yeah, so I'd like to help you, Your Honor, and let me point out, I think, an important factual distinction here, which is why I'll try to be precise about different parts of Fort Schuyler. So the board is not presented with the RFP. It's not presented with the bids. It's not presented with any of that. There may be some board members who see them because they're also working at Fort Schuyler, but if you look, for example, at the testimony of Roanne DiStito, what she explains is, in voting on this, I relied on the understanding that this was done in a competitive way in conformity with our processes. She doesn't. She doesn't review the RFP. She relies on the representations of the folks running the day-to-day, that is, in practice, Elaine Cagliaros. So it's not quite the case that the board is actually reviewing all of the documents. MS. GOTTLIEB I believe it is, Your Honor. I mean, they're relying on the representation of the person that they've entrusted to run the process, and he has represented to them, I did this process. In fact, he hadn't. But let me actually, because I think it's interesting to point out the 50-15, because it is pretty remarkably bold. In fact, the testimony at trial was even the defendants, some of the defendants, were shocked at how brazen it was. And it's really a reflection of the control that Elaine Cagliaros had there, that he was able to write this however he wanted, and people didn't even bat an eye initially. And it really leads to sort of a final point about what the board saw or didn't see. In addition to not reviewing all of the documents, and I will be clear, because I don't want to overstate, some of them, for example, like Jerry Barber, he did have day-to-day involvement, so he did see documents. Some saw the documents. Some were simply board members voting. But even those members who did see the day-to-day documents, what they didn't understand is the full picture, which is what is the import of the items in the RFP and in the process that's being put into place by Cagliaros. So they don't understand that when you put these particular items together, it favors a particular company. Jerry Barber made this point in his testimony. I think there was a question about, he says, sure, looking at the face of this, it seemed okay. But the question is, well, what if it turns out that actually these favor, in practice, a particular bidder? And he says, well, no, that would not be competitive. That, I would not consider this to be a competitive RFP if that turned out to be the case. And it did turn out to be the case. That's why I cite the testimony of Balls and Billing. They, who do know the picture because they are in the industry, they know the players, they look at it and they say, yeah, this thing is rigged. The people inside Fort Schuyler who are not in this industry are relying on Cagliaros. He's designing these. Don't know that. They don't understand what the import of a certain combination of headquartered in Buffalo, certain years of experience means, all of which are beyond dispute, beyond dispute designed to favor CORE and LP Ciminelli. And the record is replete with that. I mean, e-mails between Howe, Schuyler, Aiello, Girardi, and Relaydon to Cagliaros, talking absolutely explicitly about the ways in which they need to put in qualifications that will favor these particular bidders, things that are unique to them. That's where the 50 years comes from. Cagliaros says we need X and Y years. Howe has a meeting with Schuyler in which he says we need qualifications that are unique to LP Ciminelli. As it turns out, Cagliaros just pulls it himself from the literature. I don't understand you to be saying that as a matter of course, a state awarding construction contracts can't favor in-state construction companies, right? No. It's the fact that this was being done with Howe being paid and Cagliaros getting to keep his position, even if these are not payments in the classic sense of bribes, that it's that that corrupted the process? And that it was represented to the board that this is a competitive process. So the board was denied the truthful fact that it was not a competitive process. Do you still have to show that as a result New York was somehow paid more or got a shot of your product or was somehow injured in the ultimate construction project? The answer is no. Why not? Let me give two reasons for that. One is, as the cases make absolutely clear, I mean, the language Binday makes clear, Finazzo, and I would actually be interested in making the comparison with Finazzo, the question is whether the scheme contemplated that harm. And the nature of this scheme, the very nature of this scheme, contemplated that harm because it's about preventing somebody else who might come in and offer something better, a better service, a better value. That is the entire purpose of having a scheme like this. Shuler explained it and corroborated it. And so you don't have to show. And, in fact, as Judge Chin, you, I think, emphasized in your questioning, in a scheme like this you will almost certainly not be able to show that ultimately some other bidder would have done a lower price because you can't go back and recreate history. Counsel suggests that you need, bid rigging is not enough. It has to be bid rigging plus. I don't know if you agree with that, but if so, what's the plus here? Well, the plus, as I understand what he's saying, is you just go back to what the law is here. You have to prove a misrepresentation that goes to potentially valuable economic information. And that happened here. It happened in two ways. And this hopefully also will loop back to the question Judge Radji asked a moment ago, which is there was a representation that, in fact, a competitive process engineered to get the best value was followed. That is a representation that Fort Schuyler board members relied on. This was in their testimony in evaluating whether to contract with these parties and approve the contracts. And that goes directly to their ability, their ability to assess the benefits and burdens of any bargain, which is the language in Binday and Finazzo. But I also do want to emphasize another point about this, which is the competitive process is part of the bargain. That is something that Fort Schuyler understood they were getting. It is written into every single one of these agreements, to the notices to proceed, to the memorandum of understanding, and to the board resolutions. We are contracting with this person because they won a competitive process. It was intrinsic to the deal that their counterparty had that. And that was emphasized or explained by Jerry Barber, who said in his testimony, yes, this was critical to us because we can't continue to exist and serve our purpose if we don't have transparent and competitive bids. Why? Fort Schuyler's entire role is essentially to promote economic development through the expenditure of SUNY Research Foundation funds, and in this case economic development funds directly from the state of New York. And so it is both that this is a representation that makes it unable to, the board unable to evaluate the deals, just like in FNAZO. And, again, I can come back to that comparison. But it's also something that is of critical importance to the board. It is something that is part of the bargain they understand that they're getting. And so maybe now I'll just finally make the comment about FNAZO, which is absolutely correct. FNAZO is replete with information comparing what the market is for T-shirts, that there may have been cheaper T-shirts or different quality T-shirts. I don't think what the proof in that case, though, is that the T-shirts that were ultimately bought were bad. I actually think there was testimony, as I understand it, that there were some benefits to those T-shirts. But the point is that is a case where a very similar fraud occurs, but it occurs for a commodity, where you can readily compare the price of the T-shirts to the quality of the T-shirts. What we have here is the same type of fraud in the context of a real estate development or contracting for state money. Now, it is not easy. It is not easy to compare whether an enormous building would have been built differently or at a different price by another company in a counterfactual. But that doesn't mean that the same type of fraud can't occur in this context. And, in fact, it was the entire purpose, the design from start to finish of this process, was to avoid competition on price, was to avoid the possibility that a big national company could have come in and beat out Simonelli or Core. They were candidly successful in that. They were successful in that. And that's why you can't necessarily tell what the delta is in value, but you don't need to. And I guess the one tiny point I'll make on that is, just factually, Judge Caproni actually addressed this in substance in sentencing Mr. Simonelli. She was trying to figure out what the loss amount was. And what she said was, I find that there was an intended pecuniary loss here, based on exactly the reasoning we've just been talking about. What she said is, I can't figure out exactly what that loss was without engaging in speculation. But she found that there was an intended pecuniary loss, and she found that based on the nature of the scheme and the testimony of Kevin Shuler explaining what the purpose, and, frankly, the obvious purpose of the scheme is, which is to prevent some other company from coming in and offering something better for the victim. Thank you. Okay, rebuttal. I'm going to hold counsel to their times. It's been a long morning. I'm going to move quickly, then. I'm just going to say a word about whether this was tailored. If you read the testimony of the fellow who's head of procurement, he says, I've looked at it then, I've looked at it now, I don't see any tailoring here. That's one. Two, we're told all issues were tried at trial. Of course, the one issue that wasn't tried was, did Fort Schuyler lose any money? Three, we're told there's no proof in Fanazzo that the T-shirts were bad. Right? It's a different opinion than the one I read. Every single sentence in the sufficiency discussion is, these T-shirts were bad, the price was excessive, the quality was poor. We're told that Billings and Balls somehow proved this. Billings' testimony was, we didn't bid because we saw that 50 years, and it made us think this is for Simonelli. Right? Well, maybe. But Mr. Simonelli had nothing to do with that. It came out of that contract, or that RFP. And if that's what this case is about, right, you can't charge Lou Simonelli with it. Again, Fanazzo is about losing money and property. And that simply didn't happen in this case. And what you're being asked to do is overrule McNally. Here is what the Court said in McNally. It was not charged that in the absence of the alleged scheme, the Commonwealth would have paid a lower premium or secured better insurance. Here is Milstadt. To convict, the government had to establish that the admission was intended to cause economic harm to the village or that it could have negotiated a better deal. Here's Velosky. You must affect not only where the money was spent, but how much money was spent. Every single sentence that I've just read you, the government has told you is false, is wrong. Right? Now, then we're told you can't show, right, this kind of case. You just can't show economic harm. And we're told, read the sentencing transcript. I urge you, read the sentencing transcript. The judge did not say this was too speculative. The judge said you could have got somebody from Turner to come in and said we would have done this at a lower price. This is the only product ever produced in America that we can't determine the price. And we can't determine what's reasonable about it. The judge said that's nonsense on stilts. I submit to you it's nonsense on stilts. This could have been priced. And the reason there was no proof, the reason no one from Fort Schuyler said we paid too much, the reason that no one from Fort Schuyler said the quality was bad, all of which was said in Fanazzo, the reason it wasn't said is because it's not true. I thank the Court. Roberts. Two quick points, Your Honors. First, on tailoring, all of CORE's suggestions through Mr. Girardi's handwritten comments would have broadened the qualifications, not narrowed them. And yet there's no evidence of any other potential bidders on the Syracuse side. Second, government counsel said all we're arguing is sufficiency and that there's potential economic harm here. That's not true. We were precluded from putting on a meaningful defense because the judge, on the false premise that, quote, not getting the benefit of the bargain is breach of contract, getting it is neither here nor there in a right-to-control case, Appendix 1292, which is inconsistent with all of this Court's cases, including the two most recent ones, Calderon and Johnson. We were precluded from putting on evidence that we did good work at a reasonable price, which at a minimum is — meets the low, low bar of relevance for showing intent. The government had to prove that we had a specific intent to harm Fort Schuyler. Evidence that we did good work at a reasonable price is highly relevant to whether we intended to cause any economic harm. We were precluded from doing that. And there's evidence in the record that after this indictment and this trial, and during this trial, that Fort Schuyler did an audit of the film hub and found — the audit found that the price was reasonable. They did not try to renegotiate. They also offered to increase the payments for the manufacturing plant. That's Appendix 2598 and 2600-01. Thank you. We urge the Court to reverse the conviction. May it please the Court. So, first of all, to a point I think you made, Judge Raggi, there's no actual exclusion, there's no risk actually here that there's a potential for actual exclusion because there was an intervening event here that broke the nexus. And that is Fort Schuyler's board, the board chair, the general counsel, the legal counsel, and the procurement chief all got to vet the qualifications and determined that they were in Fort Schuyler's best interest. That clearly is an intervening event. So there was nothing untoward or nothing that prevented Fort Schuyler from negotiating with any party whom they wanted to get the — You found your clients or the two companies competent and, you know, they found their bids satisfactory, but who knows whether they could have gotten better ones? Well, the qualifications were actually Mr. Girardi's comments, as Mr. Shapiro pointed out, were — broadened the RFP. It didn't narrow it. There's no evidence that it narrowed it at all. And it — I mean, there's evidence that it chilled people from coming into the process, right? There's no evidence, Your Honor, with all due respect, that any developer in the Syracuse area was deterred by the qualifications of the RFP. Well, the bid was narrowed to that extent. I mean, it was limited to people who had had experience in the area. You mean in Syracuse? Yes. But that's a provision — the state government, and Andrew Kennedy testified to this, and I think there were others, even Mr. Shuler, that the local development requirement was what they wanted here because they valued high-quality local developers, and there was no exclusion of outer region developers partnering with a local developer in Syracuse to bid on the project. I think what's telling in this particular case is that the government originally envisioned using the testimony — and this is in the record of Huber Brewer, a local Syracuse developer, to show that there was some deterrence. However, Huber Brewer — the government had to drop that particular approach because Huber Brewer did not apply for the RFP in a timely manner. So there's absolutely no evidence of exclusion or risk of exclusion here at all. Thank you. Thank you. Just a couple of quick points. The record is clear that during the drafting process of the RFP, the chairman of the board, Dean Fuleihan, played an active role in the drafting process. The record is clear that the members of the board who voted on whether the RFP should go forward relied on Dean Fuleihan for their information. Elaine Kelliaris recused himself from all the votes. Elaine Kelliaris did not speak directly to any board member about the RFP process. So you essentially have the chairman of the board who is objectively looking at the language that has worked its way into the RFP. But it did represent that it was an honest process, right? You're talking about Elaine Kelliaris? Yeah. At no point did Elaine Kelliaris communicate that to any member of the board. Every single witness testified that Elaine Kelliaris did not communicate that to them. The government went to the jury with an argument that that was implicit in requesting that an RFP be drafted. There is not a single witness, Judge, not a single witness who testified that Elaine Kelliaris said, this RFP has been drafted without input from contractors, we don't have language in here that they thought would be useful. The RFP was drafted with input from the general counsel. Why was he hired? Why was he hired to prepare the RFP? Why was who hired? Kelliaris. Why was he entrusted with responsibility for preparing the RFP? So Dean Fuleihan, the chairman of the board, was actually entrusted with that responsibility and worked with the general counsel and worked with the chief of procurement. Elaine Kelliaris was asked by the governor to spearhead the effort to kickstart a dormant process of trying to revitalize. What was Kelliaris' involvement in the RFP? He had communications with the contractors, solicited ideas from the contractors, certainly played a role in, at a minimum, editing the RFP process. So no doubt, he played a role. But independent members of the executive committee. Do you think that self-dealing was permitted as part of that? Well, look, I'm not here to defend self-dealing as a broad proposition. What I'm here to suggest is that as a matter of right to control wire fraud, simply selecting Seminelli or CORE without more doesn't satisfy what this circuit has already said, right to control wire fraud. The question is whether they were, the board was entitled to rely on Kelliaris doing this job in a way that was fair, open, and competitive rather than infected by self-dealing. I think that the, you know, I guess two responses. One is there's absolutely no evidence in the record at all that Elaine Kelliaris was engaged in self-dealing. There's no money paid to him. There's no kickback, no bribe. This is completely different than FNAZO, where FNAZO received millions of dollars out of the revenue that was paid by Aeropostale to South Bay. That's not our case here, Your Honor. I think at the end of the day, you have competent executives who are responsible for drafting the RFP with input from Elaine Kelliaris, no doubt, who then evaluated all of the companies that submitted their responses, independent from Kelliaris. If you look at the record, each and every one of those folks said, Kelliaris did not tell us who to pick. Kelliaris did not put a thumb on the scale for any contractor. And then that same executive committee, which included the chairman of the board, the head of procurement, the general counsel, and some construction people within the organization, picked what contracts went with what contractors. Broadly speaking, there isn't evidence that Elaine Kelliaris essentially funneled this work to these individuals, but even if he did do that under Second Circuit right to control wire fraud, it's not a crime. Last point. Last point. Go ahead. Yes. Last point is, the government argued that the scheme contemplated financial harm to New York. I think that really does make the point that many of us have been trying to make, that at a minimum, at a minimum, the defendant should get a new trial because they were prepared to take that issue head on. The question of whether the construction work gave Fort Scala the benefit of the bargain goes to whether the scheme could or did cause tangible economic harm and goes to the question of whether the defendants intended to deprive Fort Scala of money or property. I respectfully request that the circuit acquit the defendants, including Dr. Kelliaris, and in the alternative, grant them a new trial. Thank you very much. Thank you all for your very fine arguments. The last case is on submission. Accordingly, I'll ask the deputy to adjourn. Court is adjourned.